UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.  CRIMINAL ACTION NO. 3:24-CR-27-KHJ-ASH-1

SAMAON E. GREENWOOD

ORDER

Before the Court is Defendant Samaon E. Greenwood's [22] Motion to Suppress. Greenwood moves to suppress all evidence seized from the warrantless search of his car during a traffic stop. The right to be secure against unreasonable searches and seizures is not a "mere second-class right[] but belong[s] in the catalog of indispensable freedoms." *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting). Unrestrained searches and seizures are among "the first and most effective weapons in the arsenal of every arbitrary government." *Id.* But this right "is one of the most difficult to protect . . . [since] there is no enforcement outside of court." *Id.* at 181. Thus, this Court does not take lightly its duty of circumscribing police conduct within the proper constitutional bounds. Leaving "no aspect of the police's conduct unscrutinized," the Court holds "the Government to its responsibility of proving the constitutional validity of its actions" and finds that the evidence seized from Greenwood's car should be suppressed. *United States v. Lopez*, 817 F. Supp. 2d 918, 925 (S.D. Miss. 2011).

I.   Background

On the evening of August 4, 2023, Jackson Police Department (JPD) Detective Gillis Brown was on patrol, driving westbound on Woodrow Wilson Avenue. Suppression Hr'g Tr. [29] at 5–6, 18, Aug. 29, 2024. He stopped at the Five Points intersection traffic light, where Woodrow Wilson Avenue meets Medgar Evers Boulevard and Livingston Road. *Id.* at 18. While at the traffic light, Brown spied Greenwood's car briefly idling at a stop sign a block ahead of him—facing northbound on Rondo Street—just before Greenwood turned left and began driving westbound on Woodrow Wilson Avenue away from Brown. *Id.* at 18–19, 21–22.[1] From his vantage at Five Points, Brown claims that he observed Greenwood's "front windshield covered with dark tint" in violation of Mississippi Code Annotated section 63-7-59(1). JPD Incident Report [23-1] at 4; *see also* [29] at 6.

Upon seeing the windshield, Brown turned on his lights to pull Greenwood over, but Greenwood kept driving slowly for about a mile until he arrived at his

---

[1] Brown repeatedly stated that Greenwood turned onto Woodrow Wilson Avenue from "Gordon Street." [29] at 6, 19–22. But he later specified on a map that Greenwood came out of a street located one block west of Gordon Street, despite misidentifying that street as Gordon Street. *Id.* at 21–22; Def.'s Map [28-3]. Brown also testified, consistent with his marking, that it was "a full block" from Five Points to the street where he first saw Greenwood and that "Gordon Street is beyond the Five Point[s] light." [29] at 19, 45. Gordon Street, however, intersects with Woodrow Wilson Avenue at Five Points. *See* [28-3]. The street that Brown marked on the map and described in his testimony is Rondo Street, not Gordon Street. *Id.*; Five Points Intersection, City of Jackson, Miss., https://www.jacksonms.gov/gis/ (click on "Ward Boundaries Map"; then search "Medgar Evers Blvd, Jackson, MS, 39213"); *see also Gov't of Canal Zone v. Burjan*, 596 F.2d 690, 694 (5th Cir. 1979) ("[O]fficial government maps have long been held proper subjects of judicial notice.").

home.[2] [29] at 7–8, 27; [23-1] at 4. This turned the stop into a "high risk stop," though Brown appeared to deny that it constituted felony fleeing. [29] at 7, 26–27. Once Greenwood stopped, Brown drew his weapon and made contact at 8:54 p.m., ordering Greenwood to lower his windows. [28-2] at 00:06. Greenwood complied. *Id.* at 00:06–00:13. As he did so, another JPD officer opened the car's rear passenger door and peered inside. *Id.* at 00:35–01:00. Meanwhile, Brown asked Greenwood if he had identification, to which he replied that his identification was in his pocket. *Id.* at 01:12–01:17. Brown then asked Greenwood if he had any weapons in the car, and Greenwood hesitated before mumbling inaudibly. *Id.* at 01:19–01:33. Shortly after, Brown ordered Greenwood to exit the car and placed him in handcuffs. *Id.* at 01:52–02:12. With Greenwood standing by the car, Brown brought out his detection dog, and the dog alerted after jumping inside Greenwood's car. *Id.* at 02:47–03:31. After stowing the dog, Brown asked Greenwood—as if unaware—what drugs he had in the vehicle, and Greenwood audibly admitted to having marijuana but denied having any other contraband. *Id.* at 03:57–04:00, 05:17–05:20.

After speaking with Greenwood, Brown searched the car. *Id.* at 05:24–14:36. During the search, Brown found 40 grams of marijuana hidden in a box of sandwich bags located between the dashboard and cupholders. *Id.* at 06:49–07:00; [23-1] at 4; *see also* [28-2] at 03:11, 14:54. He also found a handgun under the passenger's seat

---

[2] Greenwood asserts that he only continued driving so that family members or neighbors could witness his interaction with the police during the traffic stop. [22] at 2 & n.1; *see also* Body Camera Video [28-2] at 04:20–04:47.

3

equipped with an automatic sear and drum magazine. [28-2] at 08:59–09:25, 14:52, 19:15–19:18; [23-1] at 4.

After the search, Brown informed Greenwood that he was under arrest for "the possession of marijuana with a firearm." [28-2] at 15:47–15:56. At this point, he requested Greenwood's identification, and Greenwood responded again that it was in his pocket. *Id.* at 16:19–16:23. While trying to draw Greenwood's identification from the pocket, Brown discovered that Greenwood did not have his license, and he directed Greenwood to orally provide identifying information. *Id.* at 16:32–17:05. Several minutes later, Brown appeared to also charge Greenwood with being a "convicted felon in possession of a firearm." *Id.* at 21:41–21:45. Following Greenwood's arrest, the Government indicted him under 18 U.S.C. § 922(g)(1) for possessing a firearm after conviction for an armed robbery in 2003. Gov't's Resp. [23] at 2; [23-1] at 4.

Greenwood disputes whether his windshield was illegally tinted, and he argues that Brown did not have reasonable suspicion for the stop. [22] at 4. At the suppression hearing, Brown testified that he could see the windshield was tinted because it "was before dusk. . . . [T]he sun [was] not out[,] but it was still daylight where you can visual[ize] everything in clear view." [29] at 43; *see also* [28-2]. He claimed to be "[p]robably not even maybe 20 yards" (60 feet) from Greenwood's car when he observed the windshield. [29] at 43, 45–46. Greenwood disputed this fact by calling Darin Corrie, an investigator with the Federal Public Defender's Office who visited Five Points. Suppression Hr'g Tr. [32] at 4–5, 14–15 Sept. 6, 2024. After

4

reviewing a map of Five Points, Corrie testified that the distance between the traffic light and Rondo Street was at least 500 feet or "about a football field and almost a half." *Id.* at 19; [28-3].[3]

When Brown was asked how he could tell that the windshield had illegal, aftermarket tint, he stated, "I mean, because out here—you know, I'm out here and, like I say, you can look at his and tell it's not factory tinted . . . [b]ased on experience." [29] at 49. He did not elaborate on how much experience he had with observing tinted windshields. *See id.* But he told the Court that—after stopping the car—he had confirmed the "windshield was, in fact, tinted fully." *Id.* at 44. To bolster this claim, the Government introduced a photograph of Greenwood's windshield taken from the body camera video:



---

[3] Corrie earlier testified that if Brown and Greenwood were both "stopped at the stoplight," they would have been 20 or 30 yards from each other. [32] at 18. It appears that Corrie believed Greenwood was stopped at the Five Points traffic light on Gordon Street. *See id.* When defense counsel brought to his attention that Greenwood was stopped at the stop sign on Rondo Street, Corrie revised his estimate. *See id.* at 19–20.

Gov't's Windshield Photograph [28-1]; [28-2] at 03:07. Defense counsel argued that this angle, with the shadowy trees in the background, made the windshield appear dark and tinted. [29] at 12. And indeed, the video contains many other angles that show light streaming freely through the windshield:



*E.g.*, [28-2] at 05:48; *see also* Def.'s Windshield Photograph [31-1]. After reviewing a photograph from the stop, Corrie concluded that Greenwood's windshield appeared untinted. [32] at 15–16; [31-1].

During the hearing, defense counsel also highlighted four discrepancies between Brown's testimony, his report, and his body camera video. *See* [29] at 25–26, 34–40; *see also* [32] at 25–26. First, despite considering himself a "good approximator of time and distance," Brown recorded in his report that Greenwood took about five minutes to obey commands to roll his windows down and exit the vehicle. [29] at 25–26, 28; [23-1] at 4. The body camera video shows that Greenwood lowered his windows within 7 seconds of receiving Brown's first command and later

6

exited the vehicle immediately upon command 1 minute and 52 seconds into the stop. [28-2] at 00:06–00:13, 01:52.

Second, Brown also testified at the hearing—which took place roughly a year after the stop—that he observed "the odor of marijuana emanating from the vehicle" as he approached it. [29] at 10. He never mentioned this in the body camera video or in his report. *Id.* at 34–36; *see* [28-2]. Brown claimed to have omitted the fact from his report because Greenwood later admitted to having marijuana. [29] at 10. When asked how he could particularly recall the odor of marijuana after performing about 1,200 stops in the year between the Greenwood stop and the suppression hearing, Brown stated, "[M]arijuana gives you a distinguished odor," and "I vividly remember this stop. So, you know, even though it's been a year, when you start to read and recollect, you can remember the stop. Especially involving Mr. Greenwood due to the specifics of the stop." *Id.* at 35, 45. Brown did not elaborate on which specifics made the stop vividly memorable. *See id.*

Third, Brown testified that Greenwood admitted having marijuana when he first approached the car, though the video did not capture that exchange. *Id.* at 10, 37. He noted that Greenwood mumbled the admission inaudibly. [28-2] at 01:19–01:33. Defense counsel asked, "So you're saying you heard him say that he had marijuana?" and Brown responded, "The question was asked, yes, sir." [29] at 37. The video reveals, however, that the question Brown asked was whether Greenwood had any weapons, not drugs, in the car. [28-2] at 01:18–01:26.

7

Fourth, Brown claimed in his report and testimony that he saw the 40 grams of marijuana in plain view upon opening the car door to extract Greenwood. [29] at 38–39; [23-1] at 4. But the report also states that Brown had to perform "further investigation and searching" of the car to find the drugs. *Id.* at 39; [23-1] at 4. The video bears this out, showing that the marijuana was hidden within an opaque box that Brown only found after entering the car to search it. [28-2] at 06:41–07:00.

The Court also notes a fifth discrepancy. Brown claimed in his report and testimony that he detained and then arrested Greenwood for not providing a valid driver's license or proof of insurance. [23-1] at 4. *But see* [28-2] at 15:47–15:56, 19:00–19:05. But the video shows that after Greenwood first stated that he had his identification, Brown did not ask him for it again or confirm that he did not have it until after searching the car and arresting Greenwood. [28-2] at 01:12–01:17, 16:18–16:35.

Greenwood now files this [22] Motion to Suppress, moving the Court to exclude all evidence seized from the search of his car during the traffic stop.

II.    Standard

On a motion to suppress, the movant first bears the burden, by a preponderance of the evidence, of showing that the police obtained the disputed evidence unconstitutionally. *United States v. Garcia*, 99 F.4th 253, 267 (5th Cir. 2024). But if the movant produces evidence—or the facts are undisputed—that a warrantless search or seizure occurred, the burden shifts to the government to justify it. *See id.*; *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop is a seizure under the Fourth Amendment. *See United States v. Alkheqani*, 78 F.4th 707, 716 (5th Cir. 2023). Warrantless searches and seizures are presumptively unreasonable unless they fall within certain narrow exceptions. *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022). One such exception allows officers to perform brief investigatory stops if they have reasonable suspicion that the person stopped is involved in criminal activity. *See id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27–31 (1968)). The government bears the burden of proving that law enforcement had reasonable suspicion for an investigatory stop. *United States v. Palmer*, 111 F.4th 588, 592 (5th Cir. 2024). A valid stop must be (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances that justified the stop." *United States v. Roper*, 63 F.4th 473, 477 (5th Cir. 2023) (per curiam) (cleaned up).

First, "[a] traffic stop is justified at its inception when an officer has 'an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle.'" *United States v. Walker*, 49 F.4th 903, 907 (5th Cir. 2022) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *Id.* (quoting *Lopez-Moreno*, 420 F.3d at 430). When determining the existence of reasonable suspicion, courts must look at the totality of the circumstances, considering the officer's experience and factual

knowledge at the time. *See Alvarez*, 40 F.4th at 345–46. Likewise, reasonable suspicion can be based on an objectively reasonable mistake of law or fact. *United States v. Bams*, 858 F.3d 937, 942 (5th Cir. 2017). Since reasonable suspicion is a lower threshold than probable cause, a traffic stop is also justified if officers have probable cause to believe that a traffic violation has occurred. *See Walker*, 49 F.4th at 907; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Second, a stop is reasonably related in scope to the circumstances that justified it if the investigative detention lasts no longer than necessary to accomplish the stop's purpose. *See Roper*, 63 F.4th at 478. Only if an officer develops additional reasonable suspicion during the stop, may the officer continue the detention while trying to dispel that suspicion. *See id.*

When police obtain evidence through a constitutional violation, the exclusionary rule—subject to several exceptions—generally bars the prosecution from introducing it at trial. *Utah v. Strieff*, 579 U.S. 232, 237–38 (2016). The exclusionary rule applies to evidence obtained directly from an illegal search or seizure, and it also extends to evidence indirectly derived from the original violation. *Id.* at 237.

III. Analysis

The Government has failed to show by a preponderance of the evidence that Brown had reasonable suspicion to stop Greenwood, and the good-faith and attenuation exceptions to the exclusionary rule do not apply. In the totality of the circumstances, Brown's claim that he clearly saw Greenwood's windshield was

10

illegally tinted from 500 feet away at a 90-degree angle in the evening twilight beggars belief. Given the multiple discrepancies between Brown's testimony and the body camera video, the Court does not find Brown's account of observing the windshield and confirming that it was tinted to be credible. If Brown mistakenly believed Greenwood's windshield was tinted, such a mistake was not reasonable under the totality of the circumstances, and the good-faith exception is inapplicable. The Court also finds that the taint of the unlawful seizure was not attenuated by Greenwood's initial refusal to pull over or by the marijuana found in the car. Thus, the Court suppresses the evidence obtained from the stop.

    A. Reasonable Suspicion

The Court agrees with Greenwood that the stop was not justified by reasonable suspicion at its inception, so it does not consider the stop's scope. [22] at 4. The Government has repeatedly contended that Greenwood has the burden of persuading the Court that Brown did not have reasonable suspicion for this warrantless seizure. *See* [23] at 1–2; [32] at 21. The Fourth Amendment does not countenance this argument. Quite the opposite, it falls on the Government to justify a warrantless investigatory stop. *See, e.g.*, *Palmer*, 111 F.4th at 592. The Government cannot demonstrate that Brown had reasonable suspicion of illegal activity before stopping Greenwood's car. Brown's only explanation for how he determined that Greenwood's windshield had illegal tint was that he could tell because "you know, I'm out here and, like I say, you can look at his and tell it's not

11

factory tinted." [29] at 49. This falls far short of the "specific and articulable facts" needed to justify a warrantless seizure. *Walker*, 49 F.4th at 907 (cleaned up).

While Brown alleges that he observed Greenwood's windshield fully covered in dark tint, the Court remains unconvinced. The windshield's appearance, the lighting conditions, the distance between the cars, and the angle of Brown's view all eliminate any chance that he could have reasonably believed the windshield was tinted. From the outset, the video shows that the windshield was not tinted. *See* [28-2] at 01:09–01:58, 05:25–06:00. It contains many frames in which light from the setting sun can be seen brightly shining through the windshield unimpeded by tint on the glass. *Id.* At several points, the street is visible through both the windshield and the front passenger door, which had its window rolled down. *Id.* Contrasting the appearance of the street unobstructed by glass and then through the windshield's glass, the Court finds that the street appeared nearly as clear and bright through the windshield as it did through the open window. *Id.* at 05:47. The windshield did not appear to block any light from passing through it. *Id.* Moreover, the Court notes that the street looked visibly darker through Greenwood's tinted rear windows than it did through the windshield. *Compare id.* at 05:47, *with id.* at 07:50–07:53, 08:20–08:24. The Court finds that Greenwood's windshield was not tinted.

Now the Court considers whether Brown could have reasonably mistaken an untinted windshield for one that was "tinted fully." [29] at 44; *see Bams*, 858 F.3d at 942. Brown noted that he stopped Greenwood during the evening twilight, "before dusk." [29] at 43. He confirmed that "it was still daylight" and that he could see

12

"everything in clear view." *Id.* If Brown could see Greenwood's windshield in clear view while it was still daylight, he should have been able to determine that Greenwood's windshield was not tinted. Brown's failure to do so was not reasonable under the totality of the circumstances described at the hearing or shown in the video. He did not testify that his view of the windshield was obstructed in any way or that the lighting made it difficult to determine whether the windshield was tinted.

Moreover, the distance and angle of Brown's vantage make it unlikely that Brown could have clearly seen the windshield while Greenwood was stopped on Rondo Street. Though Brown claimed that he was about 20 yards from Greenwood when he saw the windshield, Corrie estimated the distance to be around 500 feet. [29] at 43; [32] at 19–20. After reviewing the map and Brown's testimony that Greenwood was "a full block" away, the Court finds Corrie's distance estimate more credible. [29] at 45. This places Brown the length of nearly one and a half football fields away from Greenwood when Brown spotted the windshield. [32] at 19. And Brown was facing westbound while Greenwood was facing northbound, indicating that Brown would have seen the windshield from the right side at a 90-degree angle with the sun setting in the direction that he was facing. *See* [29] at 18, 22. The far distance, sharply offset angle, and position of the sun all make it implausible that Brown could see Greenwood's windshield as clearly as he claims.

At the suppression hearing, Brown insisted that the windshield was tinted and that he could see it clearly, even after watching the video during his testimony.

13

*Id.* at 44. He stated that the "windshield was, in fact, tinted fully. It shows through the body camera as well." *Id.* Given how conspicuously untinted the windshield appears in the video, Brown's insistence that the windshield was fully tinted after viewing the footage reinforces that his mistaken belief was not objectively reasonable.

In argument, the Government contended that Brown's belief was objectively reasonable because he had "seen a lot of tinted windows, and . . . [Greenwood's] other windows [were] tinted. And so based on his training and experience, he believed the front windshield was actually tinted." [32] at 27. Even if Brown has seen many tinted windows, his testimony established that he cannot distinguish them from their untinted counterparts. Additionally, the discrepancies in his testimony make his account of seeing the windshield dubious to say the least. As for the Government's argument that Brown could have reasonably believed that Greenwood's windshield was tinted because his other windows were tinted, the Court disagrees. Mississippi's tint regulation scheme prohibits tint on the front windshield but permits rear windows to be tinted. Miss. Code Ann. § 63-7-59(1), (3)(b). Legally tinted rear windows do not imply an illegally tinted front windshield.

The Government also advanced the theory that Brown could have gotten behind Greenwood's car on Woodrow Wilson Avenue and confirmed, by looking through Greenwood's rear window, that his front windshield was indeed tinted. [32] at 27–28. The argument that Brown could detect dark tint on Greenwood's windshield by looking through his cruiser's own tinted windshield and again

14

through Greenwood's tinted rear window to see Greenwood's front windshield is untenable. The Court does not find it credible that Brown could have developed objectively reasonable suspicion about Greenwood's windshield by viewing it through two additional layers of tinted glass.

Lastly, the Government likened this case to *United States v. Palmer*, 111 F.4th 588, where the Fifth Circuit upheld the constitutionality of a traffic stop based on reasonable suspicion of illegal windshield tint. [32] at 22. Illegal window tint can, of course, provide reasonable suspicion for a traffic stop. *Palmer*, 111 F.4th at 593. This case, however, is distinguishable from *Palmer* because the car in that case had a tinted windshield. *Compare id.* (tinted), *with* [28-2] at 05:48 (untinted).

B. The Good-Faith Exception

In its Response, the Government argues that the good-faith exception to the exclusionary rule saves the stop and search of Greenwood's car. [23] at 5. This good-faith argument falls flat because it misunderstands the nature of the reasonable-suspicion inquiry.

The good-faith exception provides that courts should not exclude evidence when the police obtain it in "objectively reasonable reliance" on incorrect information in government databases or subsequently invalidated warrants, statutes, or binding precedents. *Davis v. United States*, 564 U.S. 229, 238–39, 241 (2011) (collecting cases). While the Supreme Court has only applied the good-faith exception to warrantless searches and seizures in several specific circumstances, the Fifth Circuit broadly applies the exception to any warrantless search or seizure

15

where officers discover evidence "in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized." *United States v. De Leon-Reyna*, 930 F.2d 396, 400 (5th Cir. 1991) (en banc) (per curiam) (cleaned up). An officer's reasonable "mistake of an operative fact" or "error of technical nature" does not justify suppressing evidence. *United States v. Whaley*, 781 F.2d 417, 421 (5th Cir. 1986).

For *De Leon-Reyna*'s general good-faith exception to apply, the conduct leading to a stop must have been objectively reasonable. But an investigatory stop made without reasonable suspicion is, by definition, objectively unreasonable. In other words, since Brown lacked reasonable suspicion, the conduct leading to the stop was unreasonable. Thus, the good-faith exception is redundant in this context because reasonable suspicion can be based on a reasonable mistake of fact. *Bams*, 858 F.3d at 942. Because Brown's mistaken belief was unreasonable, the good-faith exception is inapplicable.

C. The Attenuation Exception

Near the end of the suppression hearing, the Government made the argument that "when there is an initiation of an attempted traffic stop and a defendant flees, they failed to yield, that that changes the nature of the inquiry" so that "the officer can be dead wrong . . . about whether there is a window-tint violation, but once the person flees, they don't get to enjoy the benefits of an officer's incorrect calculation." [32] at 30–31, 33. In the same breath, it conceded that an officer's initial mistake would still have to be reasonable to justify a traffic stop. *Id.*

16

at 33. The Fifth Circuit has held that flight may attenuate the seizure of evidence from the circumstances of an illegal traffic stop enough to permit admission of the evidence at trial. *E.g.*, *United States v. Montez-Sanchez*, 535 F. App'x 440, 442–43 (5th Cir. 2013) (per curiam); *United States v. Puluc-Garcia*, 447 F. App'x 567, 567–68 (5th Cir. 2011) (per curiam). But here, the Government has not shown that the seizure of the handgun was attenuated from the circumstances of the stop.[4]

When a Fourth Amendment violation occurs, courts suppress any evidence obtained "by exploitation of that illegality," but the attenuation exception to the exclusionary rule permits admission of evidence seized "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (cleaned up). In other words, something must break the causal link between the illegal police conduct and the discovery of the evidence. *Strieff*, 579 U.S. at 238. When applying the exception, courts consider (1) the "temporal proximity" between the initial seizure and the discovery of the evidence; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." *Id.* at 239 (cleaned up). Probable cause that independently develops after an initial illegal seizure is a "critical factor attenuating the taint of the" seizure. *United States v. Cherry*, 794 F.2d 201, 206 (5th Cir. 1986). Purposeful and flagrant police misconduct must involve conscious wrongdoing, not just negligence. *United States v. Mendez*, 885 F.3d 899, 912–13 (5th Cir. 2018).

---

[4] Though afforded the opportunity, the Government did not provide the Court with supplemental authority on the issue. *See* [32] at 36–37.

The attenuation exception does not apply here because nothing broke the causal link between the unlawful stop and the discovery of the evidence. Only minutes passed between the stop and the seizure of the handgun. [28-2] at 00:06–09:25; *see also Brown v. Illinois*, 422 U.S. 590, 604 (1975) (suppressing confession when "less than two hours" separated it from unlawful arrest). Likewise, there were no intervening circumstances that allowed Brown to develop independent probable cause for a search. Mississippi's fleeing statute requires a driver to stop only when signaled to do so by an officer with reasonable suspicion of criminal activity. Miss. Code Ann. § 97-9-72(1). Brown could not have developed probable cause that Greenwood was fleeing under Mississippi law because Brown did not have reasonable suspicion to initiate the stop in the first place. Neither could the marijuana in Greenwood's car have provided independent probable cause. Even granting Brown's doubtful claim that he saw the marijuana in plain view on the center console, he would only have been able to see it because of the illegal stop. Thus, he came at the evidence by "exploitation of that illegality." *Wong Sun*, 371 U.S. at 488.

Finally, the Court finds that Brown consciously and purposefully seized Greenwood without reasonable suspicion. The lighting, distance, and angle of view all suggest that Brown did not merely make a negligent mistake. The totality of the circumstances discussed above demonstrates how implausible it is that Brown could have developed reasonable suspicion of illegal tint on Greenwood's windshield. Instead, the evidence indicates that Brown pulled Greenwood over knowing he did

not have reasonable suspicion. And the discrepancies in Brown's testimony betray a poor attempt to develop post-hoc justifications for the stop. As a result, the attenuation exception cannot save the evidence discovered in Greenwood's car from suppression.

IV. Conclusion

For the reasons stated above, the Court GRANTS Greenwood's [22] Motion to Suppress. In doing so, the Court has considered all the parties' arguments. Those arguments not addressed would not have altered the Court's decision. While the Court's "decision today is not costless," constitutional "rights are priceless." *United States v. Smith*, 110 F.4th 817, 841 (5th Cir. 2024) (Ho., J., concurring).

SO ORDERED, this 3rd day of October, 2024.

                                        s/ *Kristi H. Johnson*
                                        UNITED STATES DISTRICT JUDGE